**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Raymond Leroy TALKINGTON,**
**Defendant–Appellant.**

No. 87–1672.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1988.

Decided April 8, 1988.

Diana N. Cherry, Metnick & Barewin, Springfield, Ill., for defendant-appellant.

J. William Roberts, Asst. U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Before CUMMINGS, FLAUM and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Raymond Leroy Talkington appeals his conviction for possession of counterfeit obligations of the United States in violation of 18 U.S.C. § 472. The evidence used to convict Mr. Talkington at trial, counterfeit money, was seized by federal and state agents pursuant to a warrantless nighttime search of his home. He contends that the agents who entered his home violated his fourth amendment right to be free from unreasonable searches and seizures. He also contends that the district court committed reversible errors at trial. Because we cannot adjudicate Mr. Talkington's fourth amendment claims on this record, we remand to the district court for further factfinding. *See* 28 U.S.C. § 2106; *United States v. Napue,* 834 F.2d 1311, 1328 (7th Cir.1987); *United States v. West,* 723 F.2d 1, 3 (1st Cir.1983); *United States v. Berick,* 710 F.2d 1035, 1040 (5th Cir.), *cert. denied* 464 U.S. 899, 104 S.Ct. 255, 78 L.Ed.2d 241 (1983); *United States v. Moore,* 529 F.2d 355, 358 (D.C. Cir.1976); *Camacho v. United States,* 392 F.2d 575, 576 (9th Cir.1968); *Von Der Heydt v. Rogers,* 251 F.2d 17, 17–18 (D.C. Cir.1958). *See generally Unit-ed States v. Berry,* 560 F.2d 861, 865 (7th Cir.1977).

I

A. *Procedural Posture*

The government charged Mr. Talkington in a seven-count indictment with various offenses relating to the manufacture, dealing and possession of counterfeit money. The government subsequently dismissed two counts prior to trial. Several pretrial motions were filed, including a motion to suppress evidence obtained from a warrantless search of Mr. Talkington's home. At the suppression hearing, the district court ruled that the evidence so obtained was admissible against Mr. Talkington. Trial commenced in January 1987. On January 16, 1987, the jury returned a verdict of not guilty on four counts of the indictment. On the fifth count, however, the jury found Mr. Talkington guilty of possessing $168,240 in counterfeit money. The court conducted a sentencing hearing on April 20, 1987. At that time, the court imposed a sentence of five years imprisonment. The court also ordered restitution in the amount of $3,130 to those parties, including the government, that had received counterfeit currency from Mr. Talkington. The district court, noting that there were substantial grounds on which to appeal the constitutionality of the search, granted Mr. Talkington's request for bail pending appeal. Mr. Talkington then timely filed a notice of appeal.

B. *Facts*

1. Background

In the fall of 1986, Mr. Talkington's son, Kevin Flynt Talkington (Flynt), solicited a commercial printer, Michael Pulliam, to print approximately $240,000 in counterfeit money. Subsequently, Flynt and several of his associates passed some of these bills in various southern and mid-western cities. Eventually, one of Flynt's associates, Jeffrey Irving, sold some of the counterfeit currency to a federal agent. Thereafter, Mr. Irving agreed to assist in a joint effort by the Secret Service and the Illinois De-

partment of Criminal Investigation (DCI) to arrest Flynt. Mr. Irving arranged to purchase some of the counterfeit bills from Flynt on September 26, 1986. On that date, Flynt explained to Mr. Irving that he had to go "to his old man's house ... [t]o get the money." Tr. of Jan. 6, 1987 at 53. A surveillance team of agents then observed Flynt drive directly to Mr. Talkington's residence.

## 2. The Warrantless Entry

By that time, appellant Raymond Talkington also was under suspicion as a conspirator in the counterfeiting scheme. The agents knew that Mr. Talkington had accompanied Flynt to Florida at the time some of the counterfeit bills were passed in Panama City, Florida. They also were aware, through a concealed wire on Mr. Irving, that Flynt would obtain the counterfeit money to be sold to Mr. Irving from Mr. Talkington's home. Accordingly, the agents set up a stakeout at the Talkington residence and requested that a magistrate and an Assistant United States Attorney be placed on call. This request was honored.

The two-person surveillance team at the Talkington home observed Flynt enter and later depart. Shortly after Flynt's departure from the Talkington home (where he had presumably collected the counterfeit money for the sale to Mr. Irving), DCI agent Lonnie Satore observed a small fire, approximately one and one-half feet in circumference with flames two to three feet high, in the Talkington backyard. He could not determine who was standing at the fire or what was being burned. Agent Satore communicated his observation about the fire to fellow DCI agent John Hand. Together, the agents drove past the fire and then Agent Hand moved closer on foot. Nevertheless, they still were unable to identify either who was standing at the fire or what the individual was burning. Agent Satore then radioed Secret Service Agent Jack Fox for further direction. Although

there appears to be some conflicting evidence as to when he received the information, Agent Fox testified that, at the time Agent Satore radioed him, he knew of prior allegations that money had been burned. The record, however, shows only (1) that Agent Fox knew a single counterfeit twenty dollar bill had been burned by an informant, tr. of Dec. 23, 1986 at 243, and (2) that either the same informant or an associate of Flynt stated to Flynt to "burn that money I had last night." *Id.* at 248. There is no evidence linking the prior burnings to Mr. Talkington or the Talkington residence. Nevertheless, Agent Fox instructed Agent Satore to continue his surveillance and that he would dispatch further agents to the scene. Some ten to fifteen minutes later, according to Agent Satore's testimony, the agents linked up at the Talkington residence. After a discussion, the agents burst through the front door. Despite the help of an Assistant United States Attorney at the command post and a magistrate on call, the agents did not secure, or even attempt to secure, a search warrant.

## 3. The Consent to Search

Upon entry into the Talkington home, the agents—at least five in number and with guns drawn—conducted a "sweep search" to determine if other individuals were in the residence. After they assured themselves that only Mr. and Mrs. Talkington[1] were home, they instructed the Talkingtons to sit in the living room. A short time later, Secret Service Agent Thomas Canavit observed Mr. Talkington.make a furtive movement to the chair cushion on which he was seated. Agent Canavit investigated and found a roll of counterfeit money. At this point, the testimony of the agents and Mrs. Talkington is unclear as to the exact sequence of events. As best we can tell, Mr. Talkington briefly conferred with Mrs. Talkington. An agent then called Mr. Talkington to the kitchen. As he was walking into the kitchen, two key events transpired.

---

1. Mrs. Talkington testified at the suppression hearing that prior to their divorce in 1981, she had been married to the appellant for 20 years. Tr. of Dec. 23, 1986 at 29–30. After the divorce, however, the Talkingtons continued to live to-

gether. *See id.* at 28–30. We also note that even the government, in its brief, refers to Mrs. Talkington as the appellant's "wife." Appellee's Br. at 5, 9, 28, 38–41.

One, as Mrs. Talkington testified, uncontrovertedly, Secret Service Agent Eric Pingolt "said to me, we're waiting for an agent to body search you.... Raymond, he looked shocked, and he said, no, you're not." Tr. of Dec. 23, 1986 at 13. (She then testified that Agent Pingolt threatened her with a body search at least four or five times.)[2] Two, Mr. Talkington, according to Agent Canavit, "asked me to go easy on his wife, Betty, [and] that he'd give us what we wanted. I asked him what he meant by that, and he said, the counterfeit money." Tr. of Dec. 22, 1986 at 183. Shortly thereafter, at 9:15 p.m., Mr. Talkington signed a waiver of *Miranda* rights form. Ten minutes later, he signed a consent to search form. He then led the agents to five grocery bags containing a large quantity of counterfeit money. The agents also uncovered in Mr. Talkington's bedroom a Florida newspaper that discussed the discovery of counterfeit money in Panama City, Florida.

At 10:06 p.m., Mrs. Talkington signed a waiver of *Miranda* rights form. The record contains no evidence that she signed a consent to search form. Nevertheless, a female postal inspector conducted a body cavity search. Finally, the agents arrested Mr. Talkington at approximately 12:20 a.m. Mrs. Talkington was never arrested. Indeed, at oral argument, we were informed that she was never under suspicion.

## II

### A. *The Fourth Amendment Claims*

1. The Warrantless Entry Into Mr. Talkington's Home

■ The fourth amendment safeguards an individual's right to be free from warrantless intrusions into his home. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Warrantless searches, accordingly, are presumptively unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S.

347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). "One such exception is the exigent circumstances doctrine which recognizes that [a] 'warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant.'" *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir.) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed. 2d 486 (1978)), *cert. denied,* —— U.S. ——, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987). Accordingly, the doctrine applies to situations where the nature of the evidence is evanescent and the agents fear its imminent destruction. *Ker v. California*, 374 U.S. 23, 39–40, 83 S.Ct. 1623, 1632–33, 10 L.Ed.2d 726 (1963); *Rivera*, 825 F.2d at 156. "As an exception to the Fourth Amendment's warrant requirement, the burden is on the government to show that the warrantless entry is justified by exigent circumstances, and 'an objective standard governs the reasonableness of law enforcement officials' belief that exigent circumstances have arisen.'" *United States v. Patino*, 830 F.2d 1413, 1415 (7th Cir.1987) (quoting *United States v. Dowell*, 724 F.2d 599, 602 (7th Cir.), *cert. denied*, 466 U.S. 906, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984)). "In determining whether the agents reasonably feared imminent destruction of the evidence, the appropriate inquiry is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured. *United States v. Miller*, 800 F.2d 129, 133 (7th Cir.1986). In other words, 'were the police unreasonable in not getting a warrant in the circumstances that confronted them?' *Llaguno v. Mingey*, 763 F.2d 1560, 1564 (7th Cir.1985) (en banc)." *Rivera*, 825 F.2d at 156; *accord United States v. Napue*, 834 F.2d 1311, 1326 (7th Cir.1987).

At the time immediately prior to the warrantless entry of the Talkington home, the

---

**2.** Agent Pingolt never testified at the suppression hearing. Consequently, Mrs. Talkington's testimony is uncontroverted. Moreover, although other agents testified that they had not heard Mrs. Talkington threatened with a body

cavity search, Secret Service Agent Paul Nenninger testified that he told Mr. Talkington that Mrs. Talkington would be searched. He added, however, that "I don't recall saying body search." Tr. of Dec. 22, 1986 at 81.

agents suspected that Mr. Talkington was a participant in the counterfeiting scheme. The government contends that the "bonfire" in the backyard presented sufficient exigent circumstances to invade the Talkington home at night and without a warrant. It asks us to find reasonable their conclusion that Mr. Talkington somehow detected the surveillance and then endeavored to destroy the evidence.[3] The government also contends that the presence of numerous vehicles in the vicinity of the Talkington residence heightened the concern that counterfeit money was being destroyed because it raised the possibility that the Talkington home was teeming with conspirators.

a.

■ In dealing with the issue of whether there were exigent circumstances, the district court remarked:

We have certain indications that quite objectively sustain the authorities and law enforcement agents' belief that there has been burned counterfeit monies upon at least two occasions, references to bills being burned, and then during the course of this surveillance, right after, within a matter of 30 minutes or whatever it was that [Flynt] leaves the Sherman area, the [Talkington] home. Then we have all of these cars parked around, four cars in the duplex driveway of 409–411, it's 8:30 at night, and out here in the back we have a bonfire or some fire's going on.

Tr. of Dec. 23, 1986 at 279. Of course, factual findings of the district court at a suppression hearing are binding on us unless they are clearly erroneous. *United States v. Oglesby,* 764 F.2d 1273, 1278 (7th Cir.1985); *United States v. Streich,* 759 F.2d 579, 585 (7th Cir.), *cert. denied,* 474 U.S. 860, 106 S.Ct. 172, 88 L.Ed.2d 142 (1985). However, the only findings made here are (1) that some agents harbored a belief that money had been burned in the past and (2) that several automobiles were parked in the Talkington driveway. Despite the presence of the fire, we are troubled by the paucity of evidence in the record to support these conclusions. First, concerning the agents' belief of prior burnings, we already have noted that the record is unclear as to whether the agents had sufficient evidence to justify a belief that money either was being burned or had been burned in the past. Even the testimony of Agent Fox reveals no connection between the statements about prior burnings and Mr. Talkington or his home. Moreover, at the time that the agents made their warrantless entry, the fire was unattended and merely was smoking, without flame. Tr. of Dec. 22, 1986 at 63; Tr. of Jan. 7, 1987 at 361. This information is relevant because the presence of exigent circumstances must be evaluated at the time of the warrantless intrusion.[4] *Rivera,* 825 F.2d at 156; *see also Llaguno,* 763 F.2d at 1564. Second, as to the presence of the vehicles in the vicinity, the record reveals that the Talkington home is a duplex

**3.** The government contends that this case is indistinguishable from *United States v. Guidry,* 534 F.2d 1220 (6th Cir.1976). We do not agree. In *Guidry,* government agents suspected certain individuals of printing counterfeit money. As part of their investigation, the government had one of its agents pose as a buyer for a printing press located in the home of one of the defendants. Apparently, the transaction was unsuccessful because the agent departed the residence with the distinct feeling that "at least one of the defendants had become aware of his real purpose and identity, and he so advised his superiors." *Id.* at 1221. Shortly thereafter, another agent at the scene observed that someone had started a fire in the defendant's carport. As here, the agents could not determine who started the fire or what he was burning. The agents entered the defendant's home and seized counterfeit money when firemen arrived to put out

the fire. The Sixth Circuit upheld the validity of the search because it was reasonable—in light of the undercover agent's conviction that he had "blown his cover"—to conclude that evidence was being destroyed. Here, of course, the facts are quite different. The crucial distinction is that no agent even suggested that Mr. Talkington detected the surveillance of his home. Accordingly, we decline to rubber-stamp the validity of the search based on the fact-specific holding in *Guidry.*

**4.** It appears that the fire was used to burn litter papers from the Talkington family dog. Mrs. Talkington testifed at the suppression hearing that Mr. Talkington burned these papers on a regular basis and that the backyard contains a burn spot evidencing frequent use. Tr. of Dec. 23, 1986 at 4–5.

with a common driveway, and is located in a cul-de-sac. As the agents gathered to discuss their entry into the residence, they noted three automobiles and a pick-up truck in the driveway. Tr. of Dec. 22, 1986 at 112. They also observerved an additional five to six automobiles parked along the cul-de-sac in the vicinity of the Talkington home. However, nothing linked the vehicles to the Talkington home. Indeed, upon closing in on the front door, one agent noted that there was no noise from within the home. *Id.* at 63. Such an observation, inconsistent with a fear that several suspects were endeavoring to destroy evidence of crime, was not evaluated by the district judge.

### b.

Of much greater importance, the record does not make clear whether, under the circumstances here, the agents had time to procure a warrant. The government admits that there was a magistrate on call and that, throughout the evening, an Assistant United States Attorney was monitoring the agents' activity. Yet the district court made no finding on this issue. We can only guess at the length of time that elapsed from Agent Satore's first observation of the fire until the agents stormed the Talkington home. Without this information, we cannot determine the reasonableness of the agents' actions. Accordingly, further factfinding as to the interval between the first observation of the fire and the warrantless entry is necessary. We assume that the district court, in undertaking this inquiry, will also inquire as to whether lesser intrusions were feasible at the time the agents entered the Talkington home.

### c.

We are also concerned about the record's total silence as to whether it was possible to obtain a telephonic warrant under the circumstances. Several circuits have indicated that, at least in those circumstances where an immediate emergency is not clearly evident, a district court should address this issue in determining whether there were grounds for a warrantless entry

based on exigent circumstances. *United States v. Berick*, 710 F.2d 1035, 1038 (5th Cir.), *cert. denied*, 464 U.S. 899, 104 S.Ct. 255, 78 L.Ed.2d 241 (1983); *United States v. Cuaron*, 700 F.2d 582, 589 (10th Cir. 1983); *United States v. McEachin*, 670 F.2d 1139, 1147 (D.C.Cir.1981); *see United States v. Echegoyen*, 799 F.2d 1271, 1279 (9th Cir.1986); *see also United States v. Jones*, 696 F.2d 479, 487–88 (7th Cir.1982) (government should seek to obtain telephonic warrant whenever practicable), *cert. denied*, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983). A telephonic warrant is authorized by Fed.R.Crim.P. 41(c) where "the circumstances make it reasonable to dispense with a written affidavit." Indeed, as the District of Columbia Circuit has noted:

> The legislative history of the 1977 Amendment to Rule 41(c), allowing for telephonic warrants, indicates that Congress intended to encourage police to use the telephonic warrant procedure, particularly where the existence of exigent circumstances is a close question and the police might otherwise conduct a warrantless search. The Advisory Committee Note to the 1977 Amendment stated:

>> Use of search warrants can best be encouraged by making it administratively feasible to obtain a warrant when one is needed. One reason for the nonuse of the warrant has been the administrative difficulties involved in getting a warrant, particularly at times of the day when a judicial officer is ordinarily unavailable.... Federal law enforcement officers are not infrequently confronted with situations in which the circumstances are not sufficiently "exigent" to justify the serious step of conducting a warrantless search of private premises, but yet there exists a significant possibility that critical evidence would be lost in the time it would take to obtain a search warrant by traditional means.

>> ....

>> ... The unavailability of [a telephonic warrant] procedure ... makes more tempting an immediate resort to a war-

rantless search in the hope that the circumstances will later be found to have been sufficiently "exigent" to justify such a step.

Fed.R.Crim.P. 41(c)(2), Notes of Advisory Committee on Rules, 1977 Amendment, *reprinted in* 18 U.S.C.App., at 1672–73, 1674 (Supp. III 1979) (citations omitted). Both the House and the Senate Reports specifically referred to this language and stated that the purpose of the proposed amendment was "to encourage Federal law enforcement officers to seek search warrants in situations when they might otherwise conduct warrantless searches." S.Rep. No. 354, 95th Cong., 1st Sess. 10, *reprinted in* [1977] U.S. Code Cong. & Ad.News 527, 534: H.R. Rep. No. 195, 95th Cong. 1st Sess. 10 (1977). Indeed, one of the concerns of the House was that the proposed amendment might not have "the intended result of encouraging the use of warrants." H.R.Rep. No. 195, at 11; *see* Cong. Rec. 11,110 (1977).

*McEachin,* 670 F.2d at 1146–47.

We emphasize that it may not always be possible to obtain a telephonic warrant with sufficient speed. However, "unless it is clear that the exigency in a particular case was so great that it precluded recourse to any warrant procedure, however brief," *id.* at 1147, the government, in meeting its burden of showing exigent circumstances, should demonstrate affirmatively that it was impractical to procure one. *Id.; accord United States v. Manfredi,* 722 F.2d 519, 522 (9th Cir.1983); *Berick,* 710 F.2d at 1038; *Cuaron,* 700 F.2d at 589–90 and n. 6.

### d.

Our final concern is whether the warrantless entry merely was a subterfuge designed to act as a predicate for gaining consent. The record shows that the agent in command, Agent Fox, authorized the warrantless entry. Tr. of Dec. 22, 1986 at 105. After entering the home, the agents on the scene contacted Agent Fox and asked him when they could expect the warrant to be delivered. Agent Fox, consulting with the Assistant United States Attorney on call, told the agents to attempt to obtain consent as a first option. Mr. Talkington did not consent to the agents' search of the premises until approximately one hour after the entry. We are troubled, therefore, by the government's failure to apply for a search warrant even after the warrantless entry. No explanation was given to the district court; no explanation was given to this court. Yet, the government admits that it had both a magistrate and a government attorney on stand-by for the express purpose of obtaining a warrant.

### 2. The Voluntariness of the Consent to Search

The First Circuit has aptly articulated the standard of review of a district court's finding that a consent was voluntary:

At the outset we note that a trial court's finding of voluntary consent and its determination of the credibility of the witnesses are subject to the clearly erroneous standard of review. *United States v. Alegria,* 721 F.2d 758 (11th Cir.1983); *United States v. Phillips,* 664 F.2d 971, 1023 (5th Cir.1981) (Unit B), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). The question whether the consent to a search was in fact voluntary or was the product of duress or coercion is a question of fact to be determined by the trier of fact from the totality of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

*United States v. Kimball,* 741 F.2d 471, 474 (1st Cir.1984); *accord United States v. Rojas,* 783 F.2d 105, 107 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 195, 93 L.Ed.2d 127 (1986); *United States v. Borys,* 766 F.2d 304, 314 (7th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986). In *Schneckloth,* the Supreme Court noted:

In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, *account*

*must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.* Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches.

412 U.S. at 229, 93 S.Ct. at 2048 (emphasis supplied).

Here, of course, the issue is whether subtle police actions, as well as questions, coerced Mr. Talkington into giving his consent.

■ Again, we find the record inadequate to address this issue in a reasoned and meaningful manner. While the district court made very explicit findings as to whether or not Mr. Talkington understood the right that he was surrendering,[5] it made no findings as to whether the consent was voluntary. We are mindful that, at the beginning of the suppression hearing, the district court reminded counsel that "we know that consents are voluntary," tr. of Dec. 23, 1986 at 250, and it asked them to speak to this issue. However, at the conclusion of the hearing, when the court made its findings of fact, it ignored altogether the issue of voluntariness.

Although a district court is not required to make specific factual findings in a suppression hearing, see *United States v. Lee,* 699 F.2d 466, 468 (9th Cir.1982); *United States v. Bethea,* 598 F.2d 331, 333–34 (4th Cir.), *cert. denied,* 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979); *United States v. Smith,* 543 F.2d 1141, 1145 (5th Cir.1976), *cert. denied,* 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977), we cannot understand why the district court made specific findings as to Mr. Talkington's *knowledge* of the rights he was surrendering, but completely avoided making specific findings with respect to the matter primarily at issue—*voluntariness.* This ambiguity is even more problematic in light of the dis-

trict court's comments, two pages before the consent ruling, that it was sure Mr. and Mrs. Talkington were "terrorized" by the agents' warrantless intrusion into their home.

On this record, we cannot pass lightly over this matter. The district court apparently did not focus on many potentially coercive factors. For instance, several agents burst into the Talkington home, at night, with weapons drawn. The agents had handguns, a shotgun and a riot gun. While it has been noted that, standing alone, the number of agents present is not coercive per se, *People v. Reed,* 393 Mich. 342, 393, 224 N.W.2d 867, 878, *cert. denied,* 422 U.S. 1044, 95 S.Ct. 2660, 45 L.Ed.2d 696 (1975), "that fact in tandem with others may well result in a finding that the consent was not voluntary." W. LaFave, 3 *Search and Seizure* § 8.2(b) (1987) [hereinafter LaFave]. Indeed, the Sixth, Ninth and Tenth Circuits have declined to find consents voluntary that were made after several officials had brandished firearms. *See, e.g., United States v. Jones,* 641 F.2d 425, 429 (6th Cir.1981) (defendant was confronted by "five police officers at the scene, all of them armed, two with shotguns and others with pistols drawn"); *United States v. Marshall,* 488 F.2d 1169, 1188–89 (9th Cir.1974) (defendant "was confronted by several agents—some with drawn guns, who were obviously determined to enter [defendant's home]"); *Harless v. Turner,* 456 F.2d 1337, 1338 (10th Cir.1972) (four or five agents "routed the defendant and his wife out of bed" at 1:45 in the morning). Although we note that Mr. Talkington's consent was given approximately one hour after the armed entry, the district court made no finding as to whether this elapsed time dissipated the terror of the initial intrusion. The agents' demeanor while in the home also must be evaluated.

---

5. The district judge determined in pertinent part:

> Now, Mr. Talkington, clearly from everything that is before me, is an intelligent, mature man who has worked for twenty-five years for the postal service, and there doesn't seem to be anything here that would indicate that he did not know exactly what he was

doing when he signed the consent form, when he was given his rights, when he said point by point each one of them that he understood, that he initialed and he signed, and I cannot say that there, therefore, was—was an improper consent or that it was an invalid one. Tr. of Dec. 23, 1986 at 282.

The agents accompanied the Talkingtons wherever they moved about the house. In the opinions of at least two agents, Agent Satore and Agent Nenninger, the Talkingtons were not free to leave. Furthermore, and apparently prior to Mr. Talkington giving his consent, Mrs. Talkington testified that the agents questioned the appellant in "real loud, real mean" voices. Tr. of Dec. 23, 1986 at 14. During this questioning, the agents allegedly stated that "you better start cooperating and come clean, and we won't take you and your wife in...." *Id.* The district court's findings, however, are silent as to whether these matters were considered in its ruling on consent.

■ In addition, the agents informed Mr. Talkington several times that other agents were in the process of applying for a search warrant. Tr. of Dec. 22, 1986 at 76–77. In fact, however, no application was ever made. *Id.* at 78. While the threat to obtain a search warrant, by itself, does not vitiate a voluntary consent, it should at least be addressed as one factor under the "totality of all the circumstances" test enunciated by the Supreme Court in *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047. *See United States v. Agosto,* 502 F.2d 612, 614 (9th Cir.1974); *see also* La-Fave at § 8.2(c).

Lastly, the district court did not address the question of whether Mr. Talkington's consent to the search was prompted by the brutal treatment accorded Mrs. Talkington by the agents. The record discloses absolutely no justification for requiring her to submit to a body cavity search. She was not even a suspect. There is a strong suggestion in the record that there was a causal relationship between the threat to subject her to this highly intrusive examination and Mr. Talkington's consent to the search of the house. *See United States v. Bolin,* 514 F.2d 554, 560–61 (7th Cir.1975) (search based on consent obtained from defendant undergoing custodial interrogation, and only after he had been impliedly threatened that his girlfriend would be ar-

rested if he did not sign consent form, was invalid). Threatening the physical privacy of a woman to coerce her or her spouse to acquiesce to the government's will has been a familiar tool of totalitarian regimes.[6] It has no place in the United States. Again, more explicit findings by the district court will clarify this issue. That court is in a far better position to address ambiguities on the question of causality as well as questions of credibility and character assessment.

**B.** *The Trial Error Claims*

In addition to his fourth amendment claims, Mr. Talkington contends that the district court erred in instructing the jury that:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word.

Appellant's App. at 20; *see* Tr. of Jan. 14, 1987 at 1605–06. He contends that this "ostrich" instruction was improper and only confused the jury into thinking that one who did not possess an intent to defraud, an element of the offense of possessing counterfeit money, 18 U.S.C. § 472; *see United States v. Chisem,* 667 F.2d 1192, 1193 (5th Cir.1982), still could be guilty as an accomplice if he simply closed his eyes to the presence of counterfeit money in his home. He next asserts that a note that the court sent to the jury—without prior notice and submission to counsel—necessitates the grant of a new trial. The note, sent to the jury at 10:00 p.m., asked them to choose either to deliberate one more hour, or to suspend deliberations for the evening and return the following morning. Mr. Talkington contends that the note effectively was a "dynamite instruction," made without a proper cautionary

---

**6.** *See, e.g.,* L. Walesa, *A Way of Hope* 233–36 (1987) (describing strip search of Mrs. Walesa and her daughters by Polish authorities).

instruction against coercion of the jury, which denied him a fair trial. Finally, he submits that the government failed to prove beyond a reasonable doubt that he possessed the money with the intent to defraud.

Mr. Talkington had—to put it mildly—a less than perfect trial. For instance, the giving of an ostrich instruction has not been looked upon favorably by this court. *See United States v. Dube,* 820 F.2d 886, 892 (7th Cir.1987); *United States v. Ramsey,* 785 F.2d 184, 190–91 (7th Cir.), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986). Also, the note to the jury, without prior submission to counsel, was error. *See Rushen v. Spain,* 464 U.S. 114, 117 and n. 2, 104 S.Ct. 453, 455, and n. 2, 78 L.Ed.2d 267 (1983); *United States v. Widgery,* 778 F.2d 325, 329–30 (7th Cir. 1985); *United States v. Chaney,* 559 F.2d 1094, 1098 (7th Cir.1977). However, because, at this juncture, we remand to the district court for further factfinding on the warrantless entry and consent issues, we believe that it is premature to address these issues.

### Conclusion

We believe that the admissibility of the evidence procured as a result of the warrantless entry into the Talkington residence and the consent procured thereafter cannot be adjudicated fairly on the record before us. Accordingly, we remand this case for further development of the record with respect to these issues. We also ask that the district court address whether, in its view, there is sufficient evidence to support the judgment of conviction if it is ultimately determined that the initial warrantless entry into the Talkington home was permissible but that the later search based on consent was not.

We shall retain jurisdiction of this appeal and, upon receipt of the further findings of the district court, will proceed to adjudicate finally this appeal.

REMANDED.