**UNITED STATES of America, Plaintiff,**

v.

**Raymond TALKINGTON, Defendant.**

No. 86–30064.

United States District Court,
C.D. Illinois,
Springfield Division.

Dec. 14, 1988.

J. William Roberts, U.S. Atty., Springfield, Ill., for plaintiff.

Michael Metnick, Springfield, Ill., for defendant.

OPINION

RICHARD MILLS, District Judge:

This cause is before the Court on remand from the Court of Appeals for the Seventh Circuit for further development of the record. The circuit court has retained jurisdiction of this cause and awaits this Court's findings as stated herein to finally adjudicate the appeal. *United States v. Talkington*, 843 F.2d 1041, 1050 (7th Cir. 1988).

The circuit court cited a number of deficiencies in the original record ranging from confusion of the sequence of events to insufficient or absent findings of fact. As this Court reads the circuit court's opinion, we are to address the following issues raised by the circuit court: (1) there is confusion on the sequence of events following Raymond Talkington's "furtive movement" in the chair (*id.* at 1043); (2) whether exigent circumstances existed to justify the warrantless entry of 409 Amherst including whether the agents had sufficient evidence to justify a belief that counterfeit money either was being burned or had been burned in the past (*id.* at 1045), and whether vehicles parked in front or near the Talkington residence were tied to the Talkington residence by the investigating agents (*id.* at 1045–46); (3) whether there was time to secure a warrant between the first observation of the fire and the warrantless entry, and whether lesser intrusions were feasible (*id.* at 1046); (4) whether a telephonic warrant could have been procured (*id.*); (5) why the Government did not apply for a warrant immediately after the warrantless entry (*id.* at 1047); and (6) whether subtle police actions, as well as statements or questions, coerced Mr. Talkington into giving consent to search his home, including any potentially coercive events which had a bearing on the voluntariness of the consent, and whether the treatment of Mrs. Talkington prompted the consent to search (*id.* at 1048–49). Also, the circuit court wishes us to consider whether, in this Court's view, sufficient evidence exists to support the judgment of conviction if the warrantless entry is deter-

mined to be valid but the subsequent consent search is not. *Id.* at 1050.

## I. SEQUENCE OF EVENTS FOLLOWING TALKINGTON'S "FURTIVE MOVEMENT"

The appellate court found the record to be unclear with respect to the sequence of events following Raymond Talkington's "furtive movement." We find that the following events occurred.

At approximately 8:40–8:50 p.m., Raymond Talkington reached his hand into the cushion area of the chair where he sat. Fearing for his safety, Agent Canavit drew his weapon and ordered Raymond to remove his hand from the cushion area. Agent Canavit then had him rise from the chair, patted him down, and had him sit down again. Mr. and Mrs. Talkington then conferred for a short time (three to five minutes) on the couch.

Ten minutes later, at 9:00 p.m. or shortly before, Raymond Talkington testified that he was told to go to the kitchen by Officer Canavit. He testified that as he and Canavit were on the way to the kitchen another agent emerged from the kitchen and said to him (Raymond), "we're waiting for someone to body search her [Betty]." Tr. of Sept. 14, 1988, at 821. Thus, Raymond testified that the comment was directed to him. However, he could not testify which agent said this. He testified that he could not identify this agent because his attention was focused elsewhere. Yet, as Betty Talkington testified, this was a startling event for Raymond. It supposedly prompted him to fully cooperate with the agents. Yet, when the comment was made, he says his attention was focused elsewhere. It would seem that such a startling event as someone saying he is going to "body search" your wife would draw full and immediate attention. Had this comment really been made, it is inconceivable that Raymond's attention would not be riveted on the person who spoke those harrowing words.

Betty, testifying about the same event, stated that as Raymond left his chair on the way to the kitchen "[a]nother agent came out of the kitchen area and came through that way, *and the agent says to me* [Betty], as he's walking in, we're waiting for a female agent to body search you." *Id.* at 743. Thus, Betty testified this comment was directed to her. Yet, Betty also could not identify the agent who made the comment. Again, it is inconceivable that Betty's complete and undivided attention would not be riveted on a person who just told her she was going to be "body searched." Further, she testified without hesitation at the first suppression hearing, in December of 1986, that Agent Eric Pingolt said those words. Yet, now she is unsure who was speaking when she was allegedly told she would be "body searched." Even more telling is the fact that it was uncontrovertedly established that Agent Pingolt did not arrive at 409 Amherst until 9:30 p.m., at the earliest, and probably closer to 10:00 p.m. The alleged comment about Betty being "body searched" happened at approximately 9:00 p.m.—but in no case later than 9:15 p.m. when the waiver of *Miranda* rights form was executed. All the agents present at 409 Amherst testified that no such event took place.

Considering the conflicting testimony of Betty and Raymond, their inability to identify the speaker, and Betty's obviously false accusal of Agent Pingolt at the first hearing and her recant at this hearing, the Court finds that these witnesses are not credible. The agents' testimony was credible. We find that the alleged threat that Betty would be "body searched" is a complete fabrication.

Considering the credibility (or lack thereof) of the respective witnesses, we find that the following events took place shortly after the Talkingtons spoke on the couch. Just prior to 9:00 p.m., Raymond asked to speak to Agent Canavit and said that he would "give him [Canavit] what he wanted if he would go easy on Betty." At this point, Agent Canavit advised Raymond of his *Miranda* rights and a waiver of those rights was executed at 9:15 p.m. During this time period—9:00 p.m. to 9:15 p.m.—while Raymond was being interviewed by

Illinois Department of Criminal Investigations (DCI) Agent Hand and Agent Nenninger, Canavit spoke to Agent Fox by telephone to determine when the search warrant would arrive at 409 Amherst. Fox, aware of Raymond's wish to cooperate, had Canavit ask Raymond if he would sign a consent to search form instead of waiting for the search warrant. Fox then spoke with Raymond and told him the house could be searched only with a search warrant or consent to search. Raymond told Fox he would consent. Although Raymond denies having a conversation with Fox prior to signing the consent, we find that testimony is not credible. Only after several inquiries by the agents to make sure Raymond understood that the choice whether to sign the consent was totally up to him did Raymond sign the Illinois State Police Voluntary Consent to Search form. While explaining the consent forms to Raymond, Agent Nenninger told him that everyone in the house would be searched. This form was executed at 9:25 p.m.

The search of 409 Amherst began at 9:30 p.m. According to all accounts, Agent Pingolt arrived at 409 Amherst shortly before 10:00 p.m. Postal Inspector Marian Day arrived at 409 Amherst at 10:15 p.m. and conducted the search of Betty sometime after that.

## II. EXIGENT CIRCUMSTANCES

■ The circuit court stated that it was "troubled by the paucity of evidence in the record to support" a finding of exigent circumstances. *Talkington*, 843 F.2d at 1045. The circuit court addressed two factors within the exigent circumstances issue: (1) whether the agents had sufficient evidence to justify their belief that counterfeit money was being burned at 409 Amherst; and (2) whether any evidence linked the parked cars outside 409 Amherst to the Talkington home.

Special Agent Fox gave the order to enter 409 Amherst without a warrant because he believed evidence was being destroyed. Agent Fox has 13 years experience as a secret service agent. Drawing on this experience generally he knew that burning is a common method used in the destruction of counterfeit money. In fact, he has actually worked on a case where such an incident occurred.

Further, more specific to the instant case, Agent Fox had recollection of three conversations of Jeffrey Dean Irving, one of the members involved in the Talkington conspiracy. Irving had told Illinois DCI Agent Evans on September 24, 1986, that he (Irving) could not arrange for any more counterfeit money to be obtained from the Talkingtons because it had been burned. On September 25, 1986, Irving recanted this story and said it was a fabrication. However, all Agent Fox knew for sure, at this point, is that Irving had lied, either on the 24th about the burning, or on the 25th about the fabrication.

Next, Agent Fox learned on the afternoon of the 26th that Flynt Talkington stated that there was approximately $150,000 in counterfeit money at 409 Amherst and that Raymond wanted to get rid of it all. This would tend to confirm for Fox that Irving was lying about the burning on the 24th—at least to the extent that he said *all* the money had been burned. However, during the surveillance of 409 Amherst, Agent Fox received a report from Agents Hand and Sartore,[1] who had 11 and 17 years police experience respectively, that a fire was burning in the yard of 409 Amherst. The agents related to Fox that possibly counterfeit money was being burned.

Shortly after learning of the backyard fire, Fox was told that Flynt Talkington had taken only $63,000 of the counterfeit money from 409 Amherst, apparently leaving the balance of the $150,000 there. Fox knew, through Flynt, that Raymond wanted to get rid of all the money. Added to this was the fact that the fire was burning (1) in the backyard of a house under sur-

---

1. We note, for the benefit of the circuit court in further adjudicating this appeal, that Agent Sartore's name is misspelled (Satore) throughout the circuit court's opinion. *See* Tr. of Dec. 22, 1986, at 98 (original suppression hearing); Tr. of Apr. 20, 1987, at 16 (sentencing); Tr. of Sept. 8, 1988, at 385 (supplemental hearing).

veillance for criminal activity involving counterfeit money, (2) at approximately 8:15 p.m., and (3) with no reason for the fire, other than for the destruction of evidence, readily apparent to the observing agents. Finally, Fox knew that several surveillance vehicles (7 to 10) and a number of law enforcement personnel had been involved in the surveillance of 409 Amherst. With so much activity and, in light of the fire, Fox had a reasonable fear that the surveillance had been detected and that evidence was being destroyed. Considering all the facts available to Special Agent Fox as discussed above, the Court finds that exigent circumstances, sufficient to justify the warrantless entry of 409 Amherst, existed.

■ The circuit court seemed troubled by the fact that the cars in the driveway and around the cul-de-sac were not linked to the Talkington home by the agents prior to the warrantless entry. *Id.* at 1045–46. In the context of the exigency of the circumstances, the cars are irrelevant. The cars came into play only after the decision to enter 409 Amherst had been made. Agent Sartore brought up the fact of all the cars in his request for back-up only—not in conversing with Fox over whether to secure the residence.

■ Finally, with respect to the exigent circumstances issue, the circuit court stated: "Indeed, upon closing in on the front door, one agent noted that there was no noise from within the home. Such an observation, inconsistent with a fear that several suspects were endeavoring to destroy evidence of crime, was not evaluated by the district judge." *Id.* at 1046 (citation omitted). With all due respect, this Court does not believe that people moving about within a home, so as not to be heard from the outside of the home, is inconsistent with an endeavor to destroy evidence. In fact, it seems to cut much the other way. One would think that persons attempting to destroy evidence would be as quiet as possible so as to avoid drawing attention to themselves. Thus, we find that the absence of noise, audible from the outside of 409 Amherst, should not have arrested the

agents' fears that evidence was being destroyed within the residence.

### III. TIME TO SECURE A SEARCH WARRANT?

■ The circuit court ordered further factfinding on whether the agents had time to secure a search warrant between the first sighting of the fire by Sartore and the warrantless entry of the Talkington home. *Id.* at 1046. Agent Sartore testified that he first spotted the fire sometime after 8:00 p.m. The entry of the home was placed at anywhere from 8:30 p.m. to 8:36 p.m. by various witnesses. Thus, there was approximately 30 minutes between the first sighting of the fire and the warrantless entry.

We find that 30 minutes was not sufficient time in which to get a warrant. Assistant United States Attorney (AUSA) Harris was at home, as was the magistrate on call. To prepare the warrant, Harris would have to drive to his office in the United States Courthouse where he would meet a clerical person who would type the warrant. The lead agent on the investigation, with whom the AUSA would have worked to prepare the necessary affidavit, was involved in the arrest and processing of persons taken into custody at 1136 Daniel Street (where Flynt Talkington was arrested). The AUSA believed that the transfer of the counterfeit money from Flynt Talkington to Jeffrey Irving at 1136 Daniel Street was a necessary element in establishing probable cause to obtain the search warrant for 409 Amherst. This transfer did not occur until 8:15 p.m. to 8:30 p.m.—further limiting the time available to get a warrant. Once prepared, the warrant would have to be transported to the U.S. Magistrate's home in Springfield, Illinois, reviewed and signed by the Magistrate, and then brought to 409 Amherst in Sherman, Illinois.

Thus, there was not sufficient time to assemble all the necessary personnel, physically prepare the warrant, transport it to the magistrate, then transport it to 409 Amherst. Further, we find that considering the events that took place, in the time

span available, no lesser intrusions than the warrantless entry were available.

## IV. TELEPHONIC WARRANT

■ The circuit court expressed "concern" at the silence of the record regarding the ability of the Government agents to secure a telephonic warrant. The court stated: "Several circuits have indicated that, at least in those circumstances where an immediate emergency is not clearly evident, a district court should address this issue in determining whether there were grounds for a warrantless entry based on exigent circumstances." *Id.* at 1046.

First, this Court is unsure why the circuit court was "concerned" over the record's absence of consideration of the availability of a telephonic warrant. The circuit court cited no Seventh Circuit or United States Supreme Court decisions which require such an examination. The circuit court cites *United States v. Jones,* 696 F.2d 479, 487–88 (7th Cir.1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983), for the proposition that the Government should obtain a telephonic warrant whenever practicable. *Talkington,* 843 F.2d at 1046. We note, however, that the circuit court's admonishment in *Jones* was directed to the Government to procure such a warrant, not to the district court to make a finding of practicality of procuring one. While the instant case may be a proper one for the circuit court to declare such a finding is necessary in this circuit in future cases, it is not a proper case to criticize the district court for not having done so.

Second, under the standard set by the "several other circuits" that the district court should address the telephonic warrant issue where an "immediate emergency is not clearly evident," this Court believes that such an emergency was "clearly evident." The supplemental hearing has not changed the Court's opinion on that issue.

The AUSA, who had experience in securing telephonic warrants, testified that there was insufficient time to secure a telephonic warrant. Considering the time it would have taken to gather the necessary person-nel and to relay the information to the magistrate, whether he took the information by recording device or in longhand, we find it was impractical for the Government to have procured a telephonic warrant.

## V. FAILURE TO OBTAIN WARRANT AFTER WARRANTLESS ENTRY

■ The circuit court next expressed concern over the possibility that "the warrantless entry merely was a subterfuge designed to act as a predicate for gaining consent." *Id.* at 1047. The source of the appellate court's concern is its belief that: (1) Raymond Talkington did not consent until one hour after the warrantless entry; and (2) that Agent Fox and the AUSA on call told the agents to attempt to obtain consent "as a first option." *Id.* From the record of the supplemental hearing, this Court finds no basis for the circuit court's concern.

First, the possibility of a consent search did not arise until Raymond spoke to Agent Canavit and told Canavit that he (Raymond) wished to cooperate. This happened at approximately 9:00 p.m. The agents entered the home between 8:30 p.m. and 8:36 p.m. Thus, the record supports an interval of approximately 30 minutes between the warrantless entry and Raymond expressing his desire to cooperate with the agents. Second, the Court finds no support in the record for the assertion that the agents were told to seek consent "as a first option." Raymond expressed a willingness to cooperate which set the consent idea in motion. Upon learning of Raymond's willingness to cooperate, Fox did suggest that the consent option be pursued; but this was done only in response to Raymond's wishes to cooperate.

Finally, the agents securing 409 Amherst uniformly testified that they believed that, up to Fox's telephone conversation with Raymond, steps were being taken to secure a search warrant. Thus, in their minds no consent was necessary because a court order was being procured. Up until the time the AUSA was notified that Raymond had consented, such steps were, in fact, being taken. Thus, we find no support in the

record whatsoever that the warrantless entry was used as a subterfuge designed to gain consent to search 409 Amherst.

## VI. VOLUNTARINESS OF CONSENT

■ The circuit court found the record to be inadequate on the question of "whether subtle police actions, as well as questions, coerced Mr. Talkington into giving his consent." *Id.* at 1048. The circuit court noted several potentially coercive factors: (1) the armed entry into the house; (2) the agents' demeanor; (3) telling Raymond Talkington a search warrant was being applied for when none was ever procured; and (4) the "brutal" treatment accorded Mrs. Talkington by the agents. *Id.* at 1048–49.

First, though the armed nighttime entry into the Talkington home must have been a traumatic event for the Talkingtons, as it would have been for anyone, it was not unreasonable under the circumstances. The agents entering the residence were told to secure it and stop the destruction of evidence. Though the agents did enter by opening the unlocked door themselves, Betty testified that they knocked and rang the doorbell first and immediately identified themselves. Also, it must be remembered that the agents were not there for a social visit. They were securing a place of known criminal activity—where violence is always a possibility. They did no more than necessary to secure the residence and ensure their own safety. After ensuring their safety, the agents put away all firearms. No firearms were in the sight of the Talkingtons thereafter except Raymond's "furtive movements" in the chair and under the counter in the kitchen.

Second, on this record, considering the circumstances, we find the agents' demeanor to have been beyond reproach. The worst that can be said is that the agents spoke in "loud" and "authoritative" voices. Raymond testified that the agents did not go out of their way to be mean to Betty, they never touched Betty, and the only mistreatment he identified was simply the fact that the agents were present in his home. As far as any comments concerning a "search" of Betty, we find that there was discussion among some of the agents about finding a female agent to search Betty. However, we further find that none of this discussion was directed at Betty. Also, we find that no law enforcement personnel, at any time, used the terms "body search," "body cavity search," or any derivative thereof, other than "search."

Third, the Talkingtons were told by the agents that a search warrant was being applied for and would arrive at 409 Amherst. We find that in saying this to the Talkingtons the agents acted in good faith according to what they believed was happening. These comments were in no way used to coerce the Talkingtons into consenting to a search of their residence; nor did they have the effect of coercion. Up to the time Raymond expressed his desire to cooperate, all steps necessary to secure a warrant were taken although no warrant was ever actually applied for. However, all necessary machinery was put in motion to secure one and, absent Raymond's consent, one would have been secured.

Finally, the circuit court stated: "[T]he district court did not address the question of whether Mr. Talkington's consent to search was prompted by the *brutal* treatment accorded Mrs. Talkington by the agents." *Id.* at 1049 (emphasis added). We find that the treatment accorded Mrs. Talkington prior to the consent was reasonable under the circumstances and could not, under any interpretation, be termed "brutal." The worst that can be said is that she was spoken to in a "loud and authoritative" voice by the agents. Raymond testified that the agents did not go out of their way to be mean to her. None of the agents touched her. Other than the initial entry and Raymond's "furtive movement," she saw no weapons. As found above, no agent threatened her with a search of any kind. The incidents of her trip to the bathroom and the search by Postal Inspector Day happened well after Raymond had consented to the search; so those events are not even relevant to the voluntariness of the consent. The record reflects no treatment of Mrs. Talkington (standing alone or in combination) which

had the effect of coercing Mr. Talkington to voluntarily consent to the search of 409 Amherst.

## VII. SUPPORT FOR JUDGMENT OF CONVICTION

 In concluding its opinion, the circuit court requested "that the district court address whether, in its view, there is sufficient evidence to support the judgment of conviction if it is ultimately determined that the initial warrantless entry into the Talkington home was permissible but that the later search based on consent was not." *Id.* at 1050. We find that, in the scenario posed by the circuit court, the judgment of conviction would be supportable. If the fruits of the consent search are suppressed, the Government still has the following evidence: (1) the testimony of Michael Pulliam who printed the counterfeit money and sold it to the Defendant; (2) testimony of Jeffrey Irving concerning Flynt Talkington having procured $63,000 in counterfeit money from the Defendant's residence; (3) the sweep search of the Defendant's residence following the warrantless entry which produced five grocery bags full of counterfeit money, in plain view, as viewed by Agent Steve Fermon; and (4) the Defendant's "furtive movement" in the chair which produced a small amount of counterfeit money as secured by Agent Canavit. We find that, in this Court's view, the admissible evidence would be sufficient to support a judgment of conviction under 18 U.S.C. § 472, even if the fruits of the consent search must be suppressed.

## VIII. CONCLUSION

In conclusion, the Court feels compelled to address a number of issues raised by the reviewing court's opinion. This Court fears that the circuit court labored under some misconceptions and a misreading of the record in this case. Perhaps this explains the undue tenor and tone of the circuit court's opinion, which often reached

intemperate levels with regard to this Court's handling of these proceedings.

### A. Search of Mrs. Talkington

The circuit court and this Court are troubled by the fact that Mrs. Talkington was searched—to any extent—in light of the absence of a similar search of Raymond. We do not mean to trivialize the search of Mrs. Talkington. However, the circuit court used the term "body cavity search" to describe the type of search performed on Betty Talkington. It has become clear through the supplemental hearing that no such search took place. Though the search of Mrs. Talkington is only tangential to the issues involved here, we believe it necessary and important to use this case to point out the need for all courts to be precise in the language they use to describe the various forms of searches administered by law enforcement personnel.

According to case law and the evidence presented in this cause, the following types of searches are used:

A *physical body cavity search* is one performed *only* by medical personnel, in a clinical setting, and involves the physical (as opposed to visual) probing of body cavities beyond the surface of the skin.

A *visual body cavity search* is one in which the suspect is required to spread the lips of the vagina and/or the cheeks of the buttocks to allow visual inspection of those body cavities. This search is generally performed by non-medical personnel. As a physical body cavity search is much more intrusive, a court must clearly establish whether visual or physical probing was involved.

A *full strip search* involves a complete disrobing of the individual and involves a visual inspection only.

Also, there is a *partial strip search* which, as the name implies, involves partial disrobing and visual inspection.[2]

A number of cases have addressed issues concerning these terms. Some of these cases involved policy statements of various

---

**2.** Under the foregoing definitions, Betty Talkington was required to submit to a "partial strip search."

governmental agencies defining these terms. *See, e.g., Fann v. City of Cleveland*, 616 F.Supp. 305, 309 n. 1 (N.D. Ohio 1985) ("strip search" defined by Ohio Revised Code as "inspection of the genitalia, buttocks, breasts, or undergarments ... preceded by the removal or rearrangement of some or all of the person's clothing"); *Thorne v. Jones*, 585 F.Supp. 910, 913 (M.D.La.1984) (prison departmental regulation defines "strip search" as "a purely *visual* search ... and does not involve touching ... by department employees. Limited manual opening of a body cavity ... is permitted [but must be done by the one being searched]. The strip search does not involve probing inside the cavity."), *rev'd on other grounds*, 765 F.2d 1270 (5th Cir.1985).

Other cases point out the confusion which arises when these terms are used, but not defined. *See, e.g., Salinas v. Breier*, 695 F.2d 1073, 1077 (7th Cir.1982) ("At trial much confusion existed even among highranking officers as to the definitions of 'strip search' and 'body cavity search.' "), *cert. denied*, 464 U.S. 835, 104 S.Ct. 119, 78 L.Ed.2d 118 (1983); *Security & Law Enforcement Employees v. Carey*, 737 F.2d 187, 192 (2d Cir.1984) ("The district court used the term 'strip frisk search' to describe a search including a visual examination of the anal and genital areas of the person searched. We will refer to this latter type of inspection as a 'visual body cavity search' rather than a 'strip frisk search' since this latter terminology tends to evoke images of touching, probing or physically intruding into the body. It is important for analytical purposes to note that none of the searches ... herein involved any touches, probes or other bodily intrusions."); *see also* 3 W. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 10.5(e), at 734–35 (2d ed. 1987) (At least in the context of border searches: "The permissible limits of an otherwise lawful strip search are not even exceeded when the rectal cavity is visually penetrated.").

Finally, we note that in *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983), a search very similar to that made here was referred to by the circuit court merely as a "strip search." The Chicago Police Department search policy required a female arrestee to:

> 1) lift her blouse or sweater and to unhook and lift her brassiere to allow a visual inspection of the breast area, to replace these articles of clothing and then
>
> 2) to pull up her skirt or dress or to lower her pants and pull down any undergarments, to squat two or three times facing the detention aid and to bend over at the waist to permit visual inspection of the vaginal and anal area.

*Id.* at 1267.

The search involved in *Mary Beth G.* was consistently referred to by the circuit court as a "strip search." Yet, in the instant case, the court inexplicably refers, several times, to a lesser intrusive search of Mrs. Talkington (as she was not required to "squat two or three times") as a "body cavity search." In this Court's view, that term was used incorrectly.

### B. A Way of Hope

In connection with the search of Mrs. Talkington, the circuit court noted that "[t]hreatening the physical privacy of a woman to coerce her or her spouse to acquiesce to the Government's will has been a familiar tool of totalitarian regimes." *Talkington*, 843 F.2d at 1049. True enough. However, the circuit court then cites, in support of this proposition, "L. Walesa, *A Way of Hope* 233–36 (1987) (describing strip search of Mrs. Walesa and her daughters by Polish authorities)." *Id.* This citation does not seem to merit the parenthetical given it by the circuit court and, again, shows the need for precise language in describing events of this nature.

In the book, Mrs. Walesa is quoted as saying: " 'The two men left the room and the women searched me. They looked everywhere, all through my things, poking into every fold in the shirts and even checking through my husband's dirty laundry.' " L. Walesa, *supra*, at 235. This passage does not indicate that Mrs. Walesa was subjected to as much as a pat down search,

let alone a "strip search." The book goes on to state, Mrs. Walesa speaking:

"They searched my daughters, too, without taking their clothes off. That's when Bobinski came back and insisted that they be searched again. They started with Magda, taking off her shoes, which have orthopedic soles. They wanted to take them apart.

" 'You mustn't take them apart,' said Magda, 'they're supposed to be like that.'

"Then I asked them not to destroy my child's shoes because I didn't have another pair for her to wear. That's when they started undressing her, which made her cry. I took her in my arms and told Bobinski that I hoped the same thing would happen to his daughter one day."

*Id.* As this is an account quite different from that described in the circuit court's parenthetical, we assume that either: (1) the court meant to say: "describing strip search of one of Mrs. Walesa's daughters by Polish authorities," or (2) there is a typographical error in the page citation (though our examination of the authority has revealed no passage which supports the language used in the parenthetical).

### C. "Terrorized"

The circuit court clearly took one of this Court's remarks, made during the original suppression hearing, out of context. The circuit court referred to "the district court's comments, two pages before the consent ruling, that it was sure Mr. and Mrs. Talkington were 'terrorized' by the agents' warrantless intrusion into their home." *Talkington,* 843 F.2d at 1048. The circuit court believed that there was ambiguity in this Court's finding that Mr. Talkington voluntarily consented to the search of his home, yet said that he and his wife were "terrorized." Taken in the context in which the word "terrorized" was used, there is no such ambiguity. What this Court said was:

Now, it seems perfectly reasonable under the circumstances to me that the agents would have the authority to go in and do what they did. Now, granted Mrs. Talkington back here is terrorized, and I'm sure that Mr. Talkington was

also. It would scare the living hell out of me, or any one of us who sit in this room, including the marshals and the Assistant United States Attorney, and I am sure that if Mr. Fox were sitting in his home and had something like this happen, it would scare the living daylights out of you. Of course it would, but it goes with the territory.

Tr. of Dec. 23, 1986, at 280.

Thus, what this Court actually found was that any "terror" the Talkingtons may have experienced is inherent in the situation in which they put themselves by engaging in criminal activity. They suffered no greater "terror" than would anyone else, law enforcement personnel included, in this situation. We perceive no "ambiguity" between this finding and a finding that Mr. Talkington voluntarily consented to the search of his home.

### D. In Search of the Perfect Trial

Lastly, we take note of the circuit court's gratuitous remark that: "Mr. Talkington had—to put it mildly—a less than perfect trial." *Id.* at 1050. This comment was made in light of two alleged trial errors: (1) the giving of an "ostrich" instruction, and (2) a note sent by the Court, without notification to counsel, asking whether the jurors wished to continue to deliberate or break for the evening.

This Court is bewildered at why the circuit court even mentions these issues as they were not then being decided by the circuit court in light of the posture of the case wherein the court found it necessary to remand the case for further factfinding concerning the suppression issues. We assume that the circuit court's language about the Defendant not receiving a "perfect trial" is not an attempt to set a new standard for criminal trials. As the Supreme Court has stated: " '[A] defendant is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *Brown v. United States,* 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973) (quoting *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968)). Possibly the circuit

court was merely saying that Defendant's trial was just like any other trial—in that it was not perfect.

With respect to the "ostrich" instruction, the circuit court said: "[T]he giving of an ostrich instruction has not been looked upon favorably by this Court." *Talkington,* 843 F.2d at 1050. In support of that proposition, the circuit court cites, *inter alia, United States v. Ramsey,* 785 F.2d 184 (7th Cir.), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986). In *Ramsey,* the circuit court stated:

> The last sentence of instruction 4.05 is obscure. It is better to use an instruction that tells the jury in plain language the role of the intentional avoidance of knowledge. The model instruction in 1 Devitt & Blackmar, *Federal Jury Practice & Instructions* § 14.09 (3d ed. 1977), is more understandable, although it has turgid passages and too many ocular metaphors. A simple, but sufficient, instruction would be: "You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word." *See* Perkins & Boyce, *Criminal Law* 401 (3d ed. 1984). Either this brief instruction or the longer one from Devitt & Blackmar would tell the jury the purpose of drawing the inference and the factual basis necessary to support it.

*Id.* at 190–91 (footnote omitted).

It is this instruction, endorsed and suggested by this very circuit court, which was given—in haec verba—in this cause, by this Court!

*Ergo,* the above findings of fact are submitted in accordance with the circuit court's opinion in *United States v. Talkington,* 843 F.2d 1041 (7th Cir.1988).