*689 OPINION OF THE COURT
Phylis Skloot Bamberger, J.
The defendant is charged with criminal sale of a controlled substance in the third degree, criminal sale of a controlled substance on or near school grounds, and criminal possession of a controlled substance in the third degree. Another judge granted a Mapp hearing. On October 29, 2004 and November 1, 2004, the Mapp hearing was held before this court. Detectives Patrick Donnellan and Robert Rodriguez testified for the People.
For the reasons that follow, the motion to suppress the bag of drugs that was recovered from the defendant’s feces at a hospital is granted because it was the fruit of an illegal visual body cavity search.
The Testimony
On April 19, 2001, at approximately 9:30 p.m., Detectives Donnellan and Rodriguez were in the vicinity of 1220 College Avenue and were working as part of an 8- to 10-member narcotics enforcement field team. Donnellan, an 18-year police veteran, testified that he was the “observation officer” and was posted inside of a building approximately 60 feet away from the corner of 1220 College Avenue and was using binoculars to observe people who were standing in the area of that building. Donnellan testified that he had been to the building at least 100 times and had made about 90 narcotics arrests there.
According to Donnellan, at approximately 9:30 p.m. he was stationed at his observation post and, using his binoculars, observed a black man standing in the vicinity of 1220 College Avenue. The man, who was later identified as the defendant, “was dressed in a multi-colored Averex jacket, a gray baseball cap with the red letter C on the front of it, and blue jeans.” Donnellan further testified that he had been watching the defendant for about 20 minutes and the defendant spoke to people from the neighborhood. Donnellan testified that the defendant did nothing more than talk to the people and he had not previously seen the defendant sell drugs.
A black woman dressed in black and later identified as June Milling approached the defendant. They “had a small conversation” and Milling then handed the defendant United States currency.
Donnellan testified that he then saw the defendant step “towards the doorway of 1220 College, look to his left and to his *690 right, and then reach down behind him.” The defendant was facing out toward the street in Donnellan’s direction. Donnellan explained that the defendant “placetd] his hand into the rear” for 10 or 15 seconds, but Donnellan did not “know at this time if it was his pants or his belt area or inside.” The defendant walked up to Milling, and then handed her a “small object.” Donnellan was unable to see exactly what it was that the defendant handed to Milling. Although Donnellan could not see and did not know what the defendant was doing, as his hands were behind his back, Donnellan testified, “I know he was reaching but I — there was not a doubt in my mind what he was doing.”
Donnellan testified that when he saw the defendant and Milling from his observation post, the streetlights were on and the area was “pretty well lit,” his view of the area was not obstructed, and it was “a clear night, no rain.” Donnellan further stated that there were very few people in the area at the time he made his observations.
Donnellan testified that, after the defendant handed Milling the small object, Milling walked north on College Avenue. Over the radio, Donnellan gave a description of Milling to the field team. Detective Rodriguez testified that he heard Donnellan’s description of a “female black wearing all black” who was in the vicinity of 169th Street.
Rodriguez testified that at 9:35 p.m., about one or two minutes after receiving the radio transmission, he saw a black female dressed all in black (Milling) at 169th Street and College Avenue, two or three blocks from 1220 College Avenue. When Rodriguez approached Milling, she threw to the ground a ziplock bag that contained crack-cocaine. Rodriguez recovered the drugs and held Milling at the location until the arresting officer arrived.
Rodriguez testified that a few minutes later he received another radio transmission from Donnellan, this time describing a male black wearing a multi-colored jacket and a baseball cap who was in the area of 167th Street and Morris Avenue, about two blocks from 1220 College Avenue.[1] Donnellan sent various messages over the radio to other officers. The testimony was unclear about the sequence of these messages but Rodriguez *691 testified Donnellan told him that the defendant may have hidden contraband on his person, that “in the observation of the sale he saw him going into the back area of his — either his pants or his underwear”; that the defendant “had gone in that area [the rear] when he sold the drugs to the observation buyer”; and that “he most likely has it in his back area, cause that’s where it came' from, either back pocket. To check the back pockets, check inside of his underwear.”
About a minute later, at about 9:40 p.m., Rodriguez and Detective Delgado arrived at the location and saw a male black who was wearing “a multicolored Averex jacket and baseball cap containing a letter on it, I think it was [a] red letter.” There were no other individuals in the area who matched the description that had been given by Donnellan. Donnellan testified that the officers who stopped the defendant described what the defendant was wearing. Rodriguez held the defendant at that location until the arresting officer arrived.
While he waited, Rodriguez handcuffed the defendant and searched “his outer garments, his pockets, put everything, all his property in an envelope.” As a result of this search, United States currency was recovered from the defendant’s “pants pocket.” The defendant was handcuffed and transported to the precinct in a prisoner van.
Donnellan testified that prisoners are always searched on the street for weapons and drugs but that the police “won’t go down to a strip search until you get inside the precinct” and that “anybody arrested for narcotics is strip searched back at the precinct.” The strip search, according to Donnellan, is “standard procedure.” He further testified that if it’s a drug offense, a prisoner is always made to “squat.”
Rodriguez testified that when the defendant arrived at the precinct he was taken by the desk officer to the wall near the precinct’s first floor entrance. Donnellan arrived at the precinct at about 9:50 p.m. and saw the defendant for the first time after the transaction. He identified the defendant as “the guy that did the sale in front of 1220 College to June Milling.” Donnellan also testified that he identified Milling as the girl who came up to the defendant and gave him a sum of currency for a small object.
Donnellan testified that when he got to the precinct he learned no narcotics were found on the defendant. He told his team that the defendant had something on him. “I said, check in the rear, check his pants’ pockets or the belt area; if not, he *692 has it boosted, but I know he has something on him.” He defined “boost” as “slang for drug dealers that take the drugs, like, say, crack, in a plastic bag and put it up in their rear area.”
According to Rodriguez, after approximately five minutes at the precinct the defendant was taken to the back of the cell area for the strip search. Like Donnellan, Rodriguez testified that it is “standard procedure” to conduct strip searches “on all narcotics arrests” because a person arrested for a narcotics offense “can place narcotics in different areas of their body.” Rodriguez testified that in his experience it was common practice for drug dealers, while doing transactions, to “secrete the drugs in their rectum and then when they get the money, go to their rectum, take them out and then pass the drugs to the buyer.” Rodriguez testified he learned of the strip search policy during “training” and that he has seen “bulletins from our legal bureau” which “say Court upholds strip search, different stuff like that.”
Rodriguez also testified:
“defense counsel: Okay. And as far as the reason why you conducted this strip search is because it’s just part of the common course, that was the reason why you did it?
“rodríguez: I was — why did I do it?
“defense counsel: In this particular case, you did it because that’s what you always do?
“rodríguez: That’s what I was trained to do, yes.”
Rodriguez said there was nothing that the defendant did that would lead to the belief that the defendant had drugs in his rectum. The basis of any information about the defendant came from a Donnellan radio call that the defendant took drugs from his rear region, his pocket or maybe the back of his belt, pants or underwear. Donnellan made no reference to the rectum.
Rodriguez testified the strip search of the defendant was conducted in a cell used for holding prisoners overnight. The cell was located “right in front of the desk” at the precinct. Rodriguez testified that Detective Delgado was searching another prisoner in the cell at the same time that he was searching the defendant.
Donnellan believed the strip search took place at the end of the cell in front of other prisoners. He testified that “we strip search in the same place all the time.” The location was the precinct cell for people coming in right after arrest, about 15 *693 feet from the overflow cells where people are held overnight if central booking is overcrowded. Despite this arrangement, Donnellan said the defendant was held in an overflow cell and stripped there. Indeed, he said that some officers do the searches in front of the overflow cell area and do not put the arrestee in the cell. Donnellan said his own “preference” was to do the search in a cell with the door open. Donnellan surmised to Rodriguez, “Listen, if you don’t find anything on his pants or in — I said, He has something on him. Check him real good, especially check his rear.”
Rodriguez testified that he searched the defendant in the following manner: “I asked him to take his clothes off. He took off his shirt, he took off his pants, then he was in his underwear. I asked him to take off his underwear. He took off his underwear.” Rodriguez stated that when the defendant was “standing up naked” he was unable to see any evidence of drugs and that the defendant did not walk in a way that showed he was holding something in his rectum.
Rodriguez testified that he then asked the defendant “to turn around, bend down and cough and he said he couldn’t do that. And I asked him why not. He said he’s a Muslim and he couldn’t show another man his rear. So I told him that he had to.” He told the defendant he had other people to search.
Rodriguez testified that he asked the defendant to squat so that he could see “in between” and “inside” the defendant’s “butt cheeks.” He explained that he asked the defendant to “turn around, squat and cough” because:
“That’s the normal procedure, that’s what I have always told them, to turn around, bend down and lift up, you know, the scrotum and cough. I said, ‘bend down like a catcher, lift up your scrotum and cough,’ because that’s what — if you cough, it relaxes, drops anything that is in that vicinity.”
The defendant turned around and bent down. Rodriguez saw a cellophane wrapper in the defendant’s buttocks, and saw cellophane or a baggy in the defendant’s rectum. The cellophane wrapper was wrapped around something, and Rodriguez said “it could have been like a sandwich bag around something in between.”[2]
Rodriguez then said to the defendant, while he was still squatting, “all right, take that out.” The defendant said “okay” and *694 then he pushed the item further into his rectum so that “the only thing hanging out was a small piece of plastic” that was about one inch long, which he described as a “plastic string.”
After the defendant pushed the object “all the way up,” Rodriguez told the defendant, who was still naked, to turn around to get handcuffed but he refused. Rodriguez testified that the defendant “faced off’ and while he was standing naked “put his arms down and just stood and stared at me.” Rodriguez also said the defendant was screaming, kicking and flailing. Rodriguez then “walked up to him and grabbed his right arm and pushed him up against the wall.” Rodriguez testified that he asked his partner “to get the sergeant, and a couple of other guys came in.” Donnellan believed there was a female officer who came to the cell.
When the other officers arrived, the naked defendant was put face down on the floor. Rodriguez testified that he held the defendant’s legs and that other detectives held the defendant’s arms and the defendant was handcuffed.
Rodriguez testified that after the handcuffs were placed back on the defendant, Donnellan obtained gloves and used two of his fingers to pull at the tip of the string in an effort to remove the object. Rodriguez testified that Donnellan was unable to remove the object because the defendant tightened his buttocks and then the string broke and came out.
Donnellan, on the other hand, testified that he did not attempt to remove the object that was hanging from the defendant’s buttocks. He testified that someone else attempted to remove the item but he couldn’t “remember who it was.”
Donnellan testified that the defendant was irrational, screaming, and cursing and the supervisor said “it wasn’t worth it, we decided to take him to the hospital.” No effort was made to get a search warrant.
Rodriguez also testified his supervisors directed him to take the defendant to the hospital to remove the object that was in his rectum. He also stated that it was “standard procedure” to bring a person to the hospital under these circumstances in case “something bursts inside of him.” The time between the beginning of the strip search and the arrival at the hospital was “under an hour.”[3]
*695 At the hospital, the defendant refused to allow the doctor “to give him a shot” or to give him “anything orally.” Eventually the defendant agreed to take a suppository. However, before the suppository was administered, the defendant’s pants were pulled down and Rodriguez observed that the defendant’s underwear was covered with feces. Rodriguez testified that, using a latex glove, he removed a bag that contained crack-cocaine.
Findings and Conclusions
This court credits the informational testimony of Donnellan and Rodriguez. What the police actually did to the defendant at the precinct’s overflow area was to conduct a warrantless visual body cavity search of his anus. The search was unreasonable in violation of the state and federal constitutions. The drugs recovered from the defendant at the hospital were the fruits of the illegal search and are suppressed.
1. This was a Cavity Search.
Rodriguez and Donnellan both described that it was “standard procedure” to require every male arrested for a drug crime to remove all of his clothing, to lift up his scrotum, to squat or “bend down like a catcher” and to cough, enabling a police officer to visually inspect the anal area.[4] This procedure was entirely controlled by the officer conducting the search.
While Rodriguez and Donnellan called this a “strip search,” it was a far greater intrusion than that. A strip search requires only that a person remove his or her clothing and does not include an examination, either visually or manually, of the anus or genitals. {See e.g. Daugherty v Campbell, 33 F3d 554, 555 n 2 [6th Cir 1994] [“A strip search is an inspection of a naked individual without scrutinizing the subject’s body cavities”]; Blackburn v Snow, 771 F2d 556, 561 n 3 [1st Cir 1985] [“A ‘strip search’ . . . generally refers to an inspection of a naked individual, without any scrutiny of the subject’s body cavities”]; see also Kamins, New York Search and Seizure, at 354 [15th ed 2005] [“A strip search requires a defendant to remove most or *696 all of his or her clothing but does not require a visual or manual inspection of the genitals or anus”].)
The search that Rodriguez and Donnellan described was actually “a visual body cavity search,” a search more invasive than a strip search.[5] A visual body cavity search “usually means visual inspection of a naked body, including genitals and anus, without any contact.”[6] (N.G. v Connecticut, 382 F3d 225, 228 n 4 [2d Cir 2004]; Blackburn v Snow, 771 F2d at 561 n 3 [“A ‘visual body cavity search’ extends to visual inspection of the anal and genital areas”]; Bolden v Village of Monticello, 344 F Supp 2d 407, 411 [SD NY 2004] [a visual body cavity search “refers to a strip search including a visual examination of the anal and genital areas of the person searched”]; United States v Talkington, 701 F Supp 681, 688 [CD Ill 1988] [“A visual body cavity search is one in which the suspect is required to spread the lips of the vagina and/or the cheeks of the buttocks to allow visual inspection of those body cavities” (emphasis omitted)], affd 875 F2d 591 [7th Cir 1989]; see also Kamins, New York Search and Seizure, at 354 [15th ed 2005] [“A visual body cavity search includes a visual inspection of a person’s genitals or anus but no physical contact or intrusion”].)
Visual body cavity searches have been described as “demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.” (Mary Beth G. v City of Chicago, 723 F2d 1263, 1272 [7th Cir 1983]; see People v More, 97 NY2d 209, 213 [2002]; N.G. v Connecticut, 382 F3d 225, 233 [2d Cir 2004].)
*697 2. The Search in This Case was Conducted Incident to an Arrest and Not for Security Purposes.
The standards under New York law for determining the validity of a visual body cavity search differ depending on whether the search was conducted as an incident to an arrest or whether it was for security and order at a station house, detention center or prison. The controlling cases are People v More (97 NY2d 209 [2002]) and Bell v Wolfish (441 US 520 [1979]).
A warrantless body cavity search made incident to an arrest is valid only if the People satisfy the three-part test established by the Supreme Court in Schmerber v California (384 US 757, 770 [1966]; People v More, 97 NY2d at 214).
The first part of the test requires that the police have a “clear indication” the incriminating evidence will be found within the body of the arrestee.
“The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions [beyond the body’s surface] on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.” (Schmerber v California, 384 US at 769-770; see People v More, 97 NY2d at 213.)
The second part of the test requires exigent circumstances justifying the absence of a warrant. (Schmerber v California, 384 US at 770.) Schmerber noted that the mere fact that a person had been legally arrested does not end the inquiry {id. at 769), and that a warrant is required to execute a search beyond the surface of the body unless there is evidence that an officer “ ‘might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant’ posed a threat to the officer’s personal safety or of the destruction of the evidence.” (People v More, 97 NY2d at 214, quoting Schmerber v California, 384 US at 770.) More further defined exigent circumstances as access to weapons, destruction of evidence and absorption of drugs into the body. (People v More, 97 NY2d at 214.)
The third part of the test requires that the method used to extract the evidence be reasonable and that the extraction method be performed in a reasonable manner. (Schmerber v California, 384 US at 771-772.) More stated that “[i]n uphold *698 ing the seizure, the [Schmerber] Court noted that its decision to allow the intrusion into the petitioner’s body ‘under stringently limited conditions’ did not indicate that the Fourth Amendment ‘permits more substantial intrusions, or intrusions under other conditions’ (id. at 772).” (People v More, 97 NY2d at 213.)
By contrast, when the cavity search is to maintain security at a jail or prison, Bell v Wolfish (441 US 520 [1979]) applies. Bell was concerned with the validity of visual body cavity searches of inmates after contact visits at a mixed prison and jail facility and provides the framework for judging the legality of a security search. Under Bell the legality of a visual body cavity search at a detention center is determined by a balancing of “the need for the particular search against the invasion of personal rights that the search entails.” (Id. at 559.) In making this assessment, courts are required to consider “the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.” (Id.)
In a footnote, More noted that the search that it was reviewing was made at the scene of defendant’s arrest in his apartment, and that the case did not present the opportunity to rule on the validity of body cavity searches conducted at station houses, detention centers or correctional facilities. (People v More, 97 NY2d at 214 n.) The More footnote sets up by implication the contrast between visual body cavity searches conducted incident to an arrest and such searches conducted where issues of security and order are important to running a custodial jail or prison facility.
The footnote in More does not mean that cavity searches conducted at a station house are not conducted as an incident to an arrest. While More implicitly recognizes the Bell concern for security in institutions (although there is no cite for Bell in More), the More footnote requires an examination of the purpose of the search of the defendant conducted at the holding area of the precinct to determine if it was a security search or a search incident to an arrest.
Thus, in People v Kelley (306 AD2d 699 [3d Dept 2003], lv denied 1 NY3d 598 [2004]), the Court determined that More did not apply to the station house body cavity search in that case because the purpose of the search was to further “administrative concerns and penological interests” and not to search the defendant incident to an arrest. (Id. at 700; see also Fuller v M.G. Jewelry, 950 F2d 1437, 1448 [9th Cir 1991].)
*699 In this case, Donnellan testified that the strip search and cavity search were done at the precinct after the street search. The strip and cavity search could not be done on the street (People v Mitchell, 2 AD3d 145, 148 [1st Dept 2003]) and the precinct cell into which all arrestees were placed provided the first opportunity after transport of the arrestee from the street to the precinct. The sole reason for the strip/cavity search conducted at the precinct was to find evidence of drugs. No testimony was elicited at the hearing to show that the visual body cavity search of the defendant was conducted for any other purpose. Nor did the People make any such assertions during oral argument, and they conceded in their postargument memorandum that the search in this case was conducted incident to the defendant’s arrest for the sale of narcotics.
That the search of the defendant was not for security purposes is shown by the policy that subjected only narcotics arrestees to visual body cavity searches. People who are charged with other crimes, like possessing weapons or with crimes of violence, are not subjected to the cavity search as a matter of policy. If the visual body cavity search policy had been instituted for security purposes, the searches would not have been limited to narcotics arrests but would also include arrests for crimes that involved weapons or violence.
Moreover, while a visual body cavity search might be necessary to preserve order or security in situations in which a defendant is about to enter a jail, a prison, or a cell with other detainees (see e.g. People v Kelley, 306 AD2d at 699; Fuller v M.G. Jewelry, 950 F2d at 1448), no such considerations were present at the time of the body cavity search of the defendant. The defendant had not yet been charged or arraigned, he had not been sent to central booking for processing, and was not lodged in a courthouse cell with other arrestees. The testimony here is that there were many officers available and that at least one other person was being searched by other police officers.
Nor was there any testimony elicited at the hearing that the search was conducted to prevent the defendant from spreading contraband to other detainees or to maintain order at the station house. Indeed, at the time of the body cavity search in this case, which took place only minutes after the defendant had been arrested, the defendant did not have access to anyone other than police personnel and, therefore, was not in a position to distribute drugs that may have been secreted in a body cavity. (See e.g. Logan v Shealy, 660 F2d 1007, 1013 [4th Cir 1981] *700 [strip search of a person arrested for driving while intoxicated was unconstitutional because, inter alia, the search took place at a detention center where the arrestee was not “intermingled with the general jail population” and, thus, the strip search bore no “discernible relationship to security needs at the Detention Center”], cert denied 455 US 942 [1982].)
Because the search of the defendant’s body cavity in this case was made incident to an arrest, the constitutionality of the search is governed by More and Schmerber and is invalid.[7]
3. The Police Policy of Conducting Visual Body Cavity Searches as Incidents to Narcotics Arrests is Unconstitutional.
A policy requiring a visual examination of the anal area of every person arrested on a narcotics charge without considering the arrestees’ particular circumstances is unconstitutional. (Sarnicola v County of Westchester, 229 F Supp 2d 259, 273 [SD NY 2002] [a person may not be strip searched incident to an arrest simply because they have been “lawfully arrested for a felony involving narcotics”]; see Walsh v Franco, 849 F2d 66, 68-69 [2d Cir 1988] [a blanket policy of strip/body cavity searches for all misdemeanor arrestees is unconstitutional and particularized suspicion is required before such a search may be conducted by prison officials]; Weber v Dell, 804 F2d 796, 802 [2d Cir 1986] [same], cert denied sub nom. County of Monroe v Weber, 483 US 1020 [1987]; Dodge v County of Orange, 282 F Supp 2d 41, 85 [SD NY 2003] [strip search of all “newly-admitted detainees ar *701 rested on suspicion of a felony” is unconstitutional], appeal dismissed and case remanded on other grounds 2004 WL 1567870, 2004 US App LEXIS 14414 [2d Cir, July 14, 2004]; Murcia v County of Orange, 226 F Supp 2d 489, 494 [SD NY 2002] [“the law in this Circuit does not countenance a policy mandating strip searches of all felony arrestees simply because they stand accused of felonies”]; see also Chapman v Nichols, 989 F2d 393, 395 [10th Cir 1993] [blanket strip search policy of all detainees arrested for minor offenses is unconstitutional]; Fuller v M.G. Jewelry, 950 F2d 1437, 1445-1446 [9th Cir 1991] [policy of Los Angeles Police Department to subject all felony arrestees to strip/visual body cavity searches is unconstitutional]; Moss v Commonwealth, 30 Va App 219, 225, 516 SE2d 246, 249 [1999] [the police, who had probable cause to arrest the defendant for “simple possession of marijuana,” could not subject the defendant to a strip search even though a police officer testified that he knew from training and experience that drug dealers often conceal narcotics in their buttocks and even though the police recovered cocaine from the codefendant’s buttocks].)
Although Weber, Walsh and Chapman concern the legality of subjecting misdemeanor arrestees to strip/body cavity searches, these decisions apply equally to policies applied to felony arrestees. In Murcia v County of Orange (226 F Supp 2d 489, 494 [SD NY 2002]), the court rejected the argument that these cases are limited only to misdemeanor arrestees and based its reasoning on the Supreme Court’s decision in Tennessee v Garner (471 US 1, 14 [1985]).
In the context of Fourth Amendment searches and seizures, the Supreme Court has stated that the distinction between felonies and misdemeanors “is minor and often arbitrary.” (Tennessee v Garner, 471 US 1, 14 [1985].) As explained by the Supreme Court, “[m]any crimes classified as misdemeanors, or nonexistent, at common law are now felonies,” and “numerous misdemeanors involve conduct more dangerous than many felonies.” (Id.) The Court found “the assumption that a ‘felon’ is more dangerous than a misdemeanant untenable.” (Id.)
The decision to conduct a cavity search of the defendant was made pursuant to the unconstitutional policy of subjecting all narcotics arrestees to visual body cavity searches without regard to particularized circumstances. The illegal observation of the bag set into motion the chain of events, including the failed attempt by the police to manually remove the bag from the *702 defendant’s anus, that ultimately led to the decision to take the defendant to the hospital so that the bag could be removed under medical supervision. Accordingly, the drugs recovered from the defendant’s feces at the hospital are suppressed as the fruits of the illegal search because Rodriguez did not become aware of their existence until he ordered the defendant to strip and squat. (Wong Sun v United States, 371 US 471 [1963]; People v Centeno, 259 AD2d 277 [1st Dept 1999]; People v Theodis, 155 AD2d 339 [1st Dept 1989], lv denied 75 NY2d 872 [1990].)[8]
Moreover, the police may not testify at trial to the defendant’s act of pushing the bag further into his rectum after it was discovered as a result of the visual body cavity search. The bag was revealed as a consequence of the unlawful police action and therefore the discovery of the bag and the officers’ observation of the actions that the defendant took with respect to the bag are suppressed. (People v Butterly, 25 NY2d 159, 162 [1969]; People v Archie, 136 AD2d 553, 554 [2d Dept 1988], appeal dismissed 71 NY2d 892 [1988]; People v Torres, 115 AD2d 93 [1st Dept 1986].)
4. Police Observations Did Not Give a “Clear Indication” That Drugs were in the Defendant’s Rectum.
Notwithstanding the illegality of the search policy, the People argue that the search of the defendant was proper because it was made incident to a lawful arrest based on Donnellan’s observation that the defendant placed his hands in the back of his pants or in his rear area at the time of the transaction with Milling. This argument is factually without support and fails under People v More (97 NY2d 209 [2002]).[9]
*703 In More, the police, upon lawfully entering the defendant’s apartment, saw a crack pipe and a quantity of crack-cocaine in open view on a table. The defendant and a female companion were seated on a nearby couch. The defendant and the woman were then arrested, handcuffed, and patted down for weapons. No weapons were recovered.
“The police then separated defendant and the female in order to strip search them. Defendant initially cooperated by taking off most of his clothes, but at some point he protested and scuffled with the officers. During the search, which took place in a bedroom, the police removed a plastic bag, an outer portion of which they saw protruding from defendant’s rectum. The bag contained several individually wrapped pieces of a white rock-like substance, which later tested positive for cocaine. Drugs were also recovered from defendant’s female companion.” {Id. at 212.)
The Court, relying on Schmerber v California (384 US at 770), held, inter alia, that a warrantless body cavity search incident to an arrest is permissible only if there is a “clear indication” the incriminating evidence will be found within the body of the arrestee. (People v More, 97 NY2d at 213.)[10]
The rule of More was also used in Hughes v Commonwealth (31 Va App 447, 524 SE2d 155 [2000]). In Hughes, the police received a tip from a known and reliable informant that the defendant had been selling drugs at a particular location and that he stored his money in his left pocket and his drug supply in his “underwear area.” When a strip search yielded no contraband, the defendant was directed to bend over to expose his anus and cough. When Hughes coughed, the officer saw “a plastic bag protruding” from the defendant’s anus. The officer, using gloves, removed a bag of cocaine from the defendant’s anal cavity.
The Virginia Court of Appeals, applying the Schmerber analysis, suppressed the drugs because the police did not have a “clear indication” that contraband had been concealed in that area. The known informant, who provided the police with reli *704 able information about the presence of the money in the defendant’s pocket, had said only that drugs would be found in the defendant’s “underwear area.” He did not say anything about the presence of drugs in Hughes’ anus. (Hughes v Commonwealth, 31 Va App at 460, 524 SE2d at 162.)
Likewise, in this case, the visual body cavity search was not permissible because Donnellan did not have a “clear indication” that the drugs would be found inside the defendant’s anus because there was no objective basis for such an indication.[11] (People v Hollman, 79 NY2d 181, 194 [1992]; People v Sobotker, 43 NY2d 559, 564 [1978]; People v Cantor, 36 NY2d 106, 113 [1975]; People v Jones, 219 AD2d 417, 421 [1st Dept 1996], affd 90 NY2d 835 [1997]; People v Bandera, 204 AD2d 340, 341 [2d Dept 1994], appeal denied 83 NY2d 1002 [1994]; People v Lopez, 95 AD2d 241, 248-249 [2d Dept 1983], lv denied 60 NY2d 968 [1983].)
Donnellan was standing across the street from the defendant, 60 feet from him at night. Because the defendant was facing Donnellan, Donnellan could not see what the defendant did behind him and was unable to see if the defendant had actually secreted anything in his anus. In fact, Donnellan was so unsure of what he had seen that he told Rodriguez to check the defendant’s belt, his pockets, his underwear, his back and his rear area for contraband. Indeed, Donnellan testified that he told members of the field team that if they could not find drugs in the defendant’s pockets or belt he must have boosted the drugs. His opinion was entirely speculative and made without observation of the defendant’s actions. Moreover, Rodriguez testified that after the pat down and prior to the cavity search, the defendant was not walking or otherwise acting in a manner that would suggest that he had secreted anything in his anus.
Nor is there any merit to the argument that there was a “clear indication” that the defendant stored drugs in his anus because Rodriguez testified that in his experience the anal area *705 is a place where drug dealers frequently store their drugs. No testimony was put forward to show that anyone witnessed or had even heard that the defendant stored drugs in his anus.
Moreover, if Donnellan had actually believed that the defendant had secreted drugs in his anus, he would have naturally warned the field team to act cautiously before retrieving the bag of drugs that had been discarded by Milling; Donnellan never did that. Without any particular information that the defendant himself had stored drugs in his anus, as opposed to his pockets, belt, underwear, back or rear area, Rodriguez’s testimony about his experience with other drug dealers is not sufficient to satisfy the “clear indication” component of the Schmerber test. (See Moss v Commonwealth, 30 Va App 219, 516 SE2d 246 [1999] [officer’s testimony that he knew from training and experience that drug dealers often conceal narcotics in their buttocks and the fact that drugs were recovered from the codefendant’s buttocks was not a “clear indication” that the defendant had stored drugs in his anus and, thus, the strip search to which he was subjected was unconstitutional].)
5. There were No Exigent Circumstances Justifying the Warrantless Search.
A warrant for the cavity search is needed unless exigent circumstances justified acting without a warrant. More defines exigent circumstances as the need to prevent access to weapons, to prevent disposal of drugs, or to avoid absorption of drugs into the body. (People v More, 97 NY2d at 214; see Schmerber v California, 384 US at 770.) The very fact that the search in this case was conducted pursuant to a universal policy of searching all narcotics arrestees, without any regard to the defendant’s particular circumstances, negates a claim that the search was justified by evidence of exigent circumstances.
Further, even after the defendant had removed all of his clothing and was “standing up naked,” Rodriguez was unable to see any evidence of drugs. None of the exigencies specified by More were present.
The People claim that exigent circumstances justified the station house search because Rodriguez and Donnellan testified that “once they were unable to remove the plastic string from the defendant’s rectum, they were instructed to take him to the hospital in order to avoid any potential health risks.” (People’s mem at 17.) The argument is contrary to the basic rules of search and seizure law. Whatever information the police had about the drugs in the defendant’s rectum was the result of the *706 illegal search. The results of an illegal search cannot justify the search. (People v Sobotker, 43 NY2d 559, 565 [1978]; People v McCarthy, 14 NY2d 206, 209 [1964]; People v O’Neill, 11 NY2d 148, 153 [1962]; People v Madera, 189 AD2d 462, 465 [1st Dept 1993], affd on other grounds 82 NY2d 775 [1993]; People v Garriga, 189 AD2d 236, 238-239 [1st Dept 1993], lv denied 82 NY2d 718 [1993]; People v Feingold, 106 AD2d 583, 584-585 [2d Dept 1984]; People v Mullgrav, 23 AD2d 855, 856 [2d Dept 1965].)
Here, the police became aware of the plastic bag in the defendant’s rectum only after they conducted the visual body cavity search at the station house. Ordering the defendant to move his body so that the interior of his anus was visible was what enabled Rodriguez to see the bag. The discovery of the bag was the result of the illegal search.
Moreover, the People’s exigency argument fails because the police “cannot by their own conduct create an appearance of exigency.” (People v Levan, 62 NY2d 139, 146 [1984]; see People v Bero, 139 AD2d 581, 585 [2d Dept 1988]; People v Lott, 102 AD2d 506, 511 [4th Dept 1984].) Here the police created the alleged exigency by waiting almost an hour without seeking a warrant so they could conduct an illegal visual body cavity search and then claim exigency. The police misconduct cannot serve as the predicate for an exigent circumstance.
While the officers could seek to provide medical assistance to the defendant upon the discovery of the drugs, the drugs found cannot be used as evidence at a criminal trial. This situation is no different from any other search and seizure context: illegally seized guns and drugs cannot be admitted into evidence against the defendant although they can be used for investigative or other purposes unrelated to the defendant.
If the officers had a subjective belief that the defendant had drugs in his rectum, and was therefore in danger, they could have simply taken him to the hospital without subjecting him to a visual body cavity search. Moreover, the loss or destruction of evidence could have been prevented simply by monitoring the defendant, who was already under arrest for the drug sale. (People v More, 97 NY2d at 214.)[12]
*707 6. The Search was Conducted in a Manner That was Gratuitously Humiliating.
The search in this case also fails to satisfy Schmerber’s third element because the location in which it took place did not serve to insure the privacy, safety and dignity of the defendant. Testimony shows that the location of the search compounded the humiliation and indignity endured by the defendant at the time of the search.
The defendant was in the back of a cell. The testimony of the detectives was inconsistent because the search could have been conducted in either the overflow area, the detention pen, or outside the cells. With this conflict, and the absence of more descriptive information about the area, the People have failed to prove that the searches were conducted out of the view of others in the precinct. Further, at least one other search was ongoing when the defendant was searched, consistent with the testimony that often there were multiple searches. Finally, it is possible there was a female officer present while the defendant was naked. This process is unseemly.
7. The Search was Unlawful Because It was Left to the Unguided Discretion of the Police Officers.
The manner in which the search was conducted in this case was also unreasonable because there was no evidence of any guidelines, standards or controls for these searches. The officers were on their own in the conduct of the searches without rules or guidelines established by the police department. Nor was there any testimony that there were particular and trained supervisors (other than team leaders for the drug observations on the street) or other individuals at the precinct responsible for insuring that the searches were conducted in a manner that best preserved the dignity of those being searched and minimized the potential for the abuse and humiliation of those subjected to the search.
The police are required to follow established rules and guidelines before setting up an automobile checkpoint or *708 conducting an inventory search. (See Matter of Muhammad F., 94 NY2d 136, 142 [1999] [an automobile checkpoint “must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers”], cert denied sub nom. Corporation Counsel of City of N.Y. v Muhammad F., 531 US 1044 [2000]; People v Galak, 80 NY2d 715, 719 [1993] [an inventory search should be conducted pursuant to “an established procedure clearly limiting the conduct of individual officers that assures that the searches are carried out consistently and reasonably and do not become little more than an excuse for general rummaging to discover incriminating evidence”].) If the police are required to follow particular sets of rules in these instances where there is no bodily intrusion they must surely be required to follow an established set of rules before they can legally subject a person to a visual body cavity search by forcing them to squat and cough while naked in front of strangers in a location with unsupervised police officers and no access to civilian help.
Accordingly, this court holds that under the circumstances of this case, the visual body cavity search of the defendant at the station house was not for security purposes and was unreasonable because the police did not obtain a warrant before executing the search. (People v More, 97 NY2d at 214.)
Conclusion
The motion to suppress the money recovered from the defendant’s person at the time of his arrest on the street is denied. The motion to suppress the bag of drugs that was recovered from the defendant at the hospital is granted.

. Donnellan testified that a few minutes after his transaction with Milling the defendant left 1220 College Avenue and made a left turn toward 168th Street and Morris Avenue. Donnellan then “radioed the field team” and told them the direction the defendant “was going in, and I gave them exactly — I repeated his description numerous times so they wouldn’t be mistaken.”

. Rodriguez said he made his observation before the defendant coughed.

. Either in the ambulance or the hospital, Rodriguez asked the defendant repeatedly whether he had drugs in his body, tried to get the defendant to *695 give up the drugs and tried to persuade the defendant that his conduct was only a misdemeanor. The defendant’s responses were not the subject of CPL 710.30 notice and the defense did not request any relief concerning them. The People offered no evidence that Miranda notice was given.

. The testimony did not specify the gender of the narcotics arrestee to which this policy applies. However, based upon Rodriguez’s statement that the arrestee was required to lift his scrotum, the policy described in the testimony is the one applied to male narcotics arrestees. There is no evidence about the treatment of women under the policy.

. A second type of body cavity search, which is not at issue in this case, is a manual body cavity search. A manual body cavity search “includes some degree of touching or probing of body cavities.” (Blackburn v Snow, 771 F2d at 561 n 3.) Rodriguez testified that Donnellan’s fingers never went inside the defendant’s rectum when he attempted to remove the plastic bag.

. The terminology used by the courts to differentiate between strip searches and visual body cavity searches is often inconsistent and frequently a court’s reference to strip search is actually to a strip/body cavity search. (See Sarnicola v County of Westchester, 229 F Supp 2d 259, 272 n 5 [SD NY 2002] [“the case law reveals stark and significant discrepancies in the definitions of terms such as ‘strip search’ and ‘body cavity search’ ”]; Simonitsch, Visual Body Cavity Searches Incident to Arrest: Validity Under the Fourth Amendment, 54 U Miami L Rev 665, 667 [2000] [“the terms used to describe and categorize the searches, such as strip search, visual body cavity search, and physical body cavity search, are often used interchangeably in court opinions,” which has resulted in a “confused body of law”].) This opinion cites cases based on the scope of the search rather than the label that has been placed on the search by the court.

. Even under the Bell factors, the search in this case was invalid. With respect to the “scope of the particular intrusion,” the visual body cavity search to which the defendant was subjected was extremely invasive, degrading and humiliating in that it not only required the defendant to remove all of his clothing and lift his scrotum but as he stood naked in the cell, he was required to bend down and squat so that the interior of his anus could be viewed by the detective. The search of the defendant was conducted in a manner that was gratuitously humiliating (see section 6 infra), and which violated the defendant’s rights because it was left to the unguided discretion of the searching officers (see section 7 infra). The search was also unjustified because it was done pursuant to an unconstitutional policy that subjected all narcotics arrestees to visual body cavity searches (see section 3 infra), because Donnellan engaged in pure speculation when he told Rodriguez that the defendant may have secreted contraband in his anus (see section 4 infra), and because no testimony was elicited at the hearing that the search was done for security or penological interests. The location of the search, which took place in front of at least one other arrestee and in an area where the defendant’s naked body could have been viewed by more people than the officers conducting the search, did not serve to insure the privacy, safety and dignity of the defendant. A balancing of the four Bell factors shows that the invasion of the defendant’s personal rights as a result of the strip/body cavity search outweighed the need “for the particular search” in this case (Bell v Wolfish, 441 US at 559).

. The People have not argued that the drugs are admissible under the inevitable discovery doctrine even if the station house search was illegal. Nonetheless, if such an argument had been raised by the People, it would have been rejected by this court because the drugs protruding from the defendant’s anus at the station house were “primary evidence” that was discovered as a result of the illegal search. (People v Stith, 69 NY2d 313, 318-319 [1987].)

. Although not relied on by the People, there is authority for the proposition that a person may be strip searched based solely on the fact that he or she has been lawfully arrested for a felony drug offense. (See e.g. People v Davis, 15 AD3d 723 [3d Dept 2005]; People v Edmonds, 272 AD2d 278 [1st Dept 2000], lv denied 95 NY2d 889 [2000]; People v Tejada, 270 AD2d 655, 657 [3d Dept 2000], lv denied 95 NY2d 805 [2000]; People v Harris, 217 AD2d 791 [3d Dept 1995], lv denied 87 NY2d 846 [1995]; People v Scott, 210 AD2d 920 [4th Dept 1994], lv denied 85 NY2d 942 [1995].) These cases are inapposite because the defendant in this case was subject to a visual body cavity search and not a mere strip search. Moreover, the above-cited cases contain no legal reason *703 ing to support their conclusions and in light of state and federal opinions the issue needs to be the subject of further analysis.

. More did not decide whether there was a “clear indication” that the drugs would be found inside the body of the defendant in that case but, instead, based its decision on the absence of exigent circumstances and concluded that a warrant was needed. (People v More, 97 NY2d at 214.)

. More does not fit into the traditional probable cause or reasonable suspicipn continuum. There are state and federal authorities that appear to hold that a “clear indication” is equivalent to a finding of probable cause. (See e.g. Matter of Abe A., 56 NY2d 288, 297 [1982]; Fuller v M.G. Jewelry, 950 F2d 1437, 1449 [9th Cir 1991]; but see United States v Montoya de Hernandez, 473 US 531, 540 [1985] [the words “clear indication” in “Schmerber were used to indicate the necessity for particularized suspicion that the evidence sought might be found within the body of the individual”].) However, regardless of the particular standard that applies, there was no “clear indication” in this case that the defendant had secreted drugs in his rectum.

. The People argue that More is inapplicable to this case because the bag of drugs was recovered from the defendant at the hospital and not at the precinct. This argument is rejected because the location of the recovery of the drugs is not relevant to the legality of the search. As set forth above, the police learned that there was a bag in the defendant’s rectum only after they *707 conducted the visual body cavity search of the defendant at the station house. The recovery of the bag from the defendant’s stool at the hospital was illegal because it was the fruit of the illegal visual body cavity search that took place at the station house. The People’s argument is a form of inevitable discovery not recognized in New York (see n 8, supra), and has the effect of leaving a defendant without protection from illegal police conduct. (See Simonitsch, Visual Body Cavity Searches Incident to Arrest: Validity Under the Fourth Amendment, 54 U Miami L Rev 665, 682-688 [2000].)